IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 5, 2024 Session

**STATE OF TENNESSEE v. BENJAMIN CLOE BYRER**

**Appeal from the Circuit Court for Gibson County**
**No. H-9901      Don R. Ash, Judge**

**No. W2023-00483-CCA-R3-CD**

The Defendant, Benjamin Cloe Byrer, was convicted by a Gibson County Circuit Court jury of second degree murder, a Class A felony. *See* T.C.A. § 39-13-210 (2018). The Defendant was sentenced to nineteen years' incarceration. On appeal, he contends that the evidence is insufficient to support his conviction. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JILL BARTEE AYERS, JJ., joined.

David W. Camp (on appeal) and Daniel Taylor (at trial), Jackson, Tennessee, for the appellant, Benjamin Cloe Byrer.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas and Brent C. Cherry, Senior Assistant Attorneys General; Frederick Agee, District Attorney General, Scott Kirk and Nina Seilor, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the March 2012 death of James Calene. At the trial, Randy Russell testified that at the time of the victim's death, the victim had rented a bedroom inside Mr. Russell's home for about two years. Mr. Russell rented the home from the Defendant's uncle. Mr. Russell and the victim were good friends and socialized regularly at the home with a small group of friends, which at times included the Defendant. Mr. Russell had known the Defendant and the Defendant's family for about twenty-five years. Mr. Russell said that he considered the Defendant a friend but that the Defendant "wasn't acting right" around the time of the victim's death. Mr. Russell said the Defendant lived with his parents about one-half mile from Mr. Russell's home. Mr. Russell described the

Defendant's appearance in 2012 as muscular, tall, and like a football player and recalled that the Defendant frequently exercised by "running up and down the street with railroad ties."

Mr. Russell testified that about two or three weeks before the victim's death, the Defendant was involved in an "altercation" with Yancy Potts. Mr. Russell said Mr. Potts was a friend who frequented Mr. Russell's home. Mr. Russell said that the Defendant and Mr. Potts were involved in a "scuffle" in the kitchen, that the men "were tied up," and that Mr. Russell pulled the Defendant off Mr. Potts to break up the fight. Mr. Russell said he informed his landlord of the incident and told the landlord that he did not want the Defendant at the home because "of the way he was acting." Mr. Russell said he told the Defendant not to come to his home.

Mr. Russell testified that around Friday, March 30, 2012, he, the victim, Mr. Potts, Kendrick Wayde, and Samantha Barringer were at Mr. Russell's home. Mr. Russell said they drank beer and made plans to celebrate Mr. Russell's birthday. He said that around 9:30 p.m., he received a telephone call from Chris Lynch, who wanted him to go to "Mom's bar." Mr. Russell said that Mr. Lynch picked him up and drove him to the bar. Mr. Russell said that Mr. Potts, Mr. Wayde, and Ms. Barringer were preparing to leave the home when Mr. Russell and Mr. Lynch left to go to the bar. Mr. Russell said that the victim was sleeping in the victim's bedroom when he and Mr. Lynch left the home. Mr. Russell recalled that the victim had been suffering from a "seasonal cold or head cold" and had to wake early for work the next day.

Mr. Russell testified that Mr. Lynch was a first responder and carried his "repeater" while they were at the bar. Mr. Russell said that after they had been at the bar for about three hours, they heard a report of a non-responsive man at Mr. Russell's address. Mr. Russell said they left the bar and returned to the home. Mr. Russell said that the police, paramedics, and the Defendant were at the home and that the victim was deceased in the kitchen. Mr. Russell said that his home was "a wreck." He found broken furniture, a "tipped over" computer, and a broken cell phone. He said that the home had not been in this condition when he left with Mr. Lynch.

On cross-examination, Mr. Russell testified that the victim had not felt well for several days before his death and that the victim had "problems breathing." Mr. Russell agreed that he previously reported leaving for the bar between 10:45 and 11:30 p.m. and noted that it had been ten years since the victim's death. Mr. Russell agreed, though, that he was away from the home for about three hours, that he did not know who "came and went" from the home when he was at the bar, and that he did not lock the front door when he left.

-2-

Mr. Russell testified that the victim and the Defendant had been friends. When asked if he told the police that the Defendant had been welcome at the home, Mr. Russell said he told the police that "we were more like a misfit family, but at that time I didn't -- We were friends, but at that particular time I didn't want [the Defendant] at my house." After reviewing a transcript of his recorded interview, he agreed he told the police that the Defendant had been welcome at the home. He said that the Defendant could come to the home anytime "as long as he acted right . . . or didn't act as a fool." Mr. Russell agreed that the Defendant and the victim did not have "issues" and were friends.

Mr. Russell testified that he did not state during his preliminary hearing testimony that the Defendant had been "barred from the house" at the time of the victim's death but that he was not asked at the preliminary hearing if the Defendant was permitted to be at the home.

Douglas Lemonds testified that in 2012, he lived about one-half mile from Mr. Russell's home and that they socialized periodically on the weekends. Mr. Lemonds considered the victim and the Defendant to be his friends and said that the Defendant socialized at Mr. Russell's home on the weekends. Mr. Lemonds said the Defendant did not socialize at Mr. Lemonds's home frequently.

Mr. Lemonds testified that around 6:00 or 6:30 p.m. on the night of the victim's death, the Defendant came to his home. Mr. Lemonds recalled that he and the Defendant drank beer and "peddl[ed] around" in the garage. Mr. Lemonds did not notice the amount of alcohol the Defendant consumed but acknowledged they drank "[a] little moonshine." Mr. Lemonds said the Defendant remained at the home for about four hours and left at approximately 10:30 p.m. Mr. Lemonds said the Defendant stated that he was going to the victim's home when the Defendant left in his truck.

Mr. Lemonds testified that while the Defendant was at his home, the Defendant exchanged text messages "all night" and stepped outside to take "a couple of phone calls." Mr. Lemonds did not know to whom the Defendant spoke. Mr. Lemonds said the Defendant's mood was good when the Defendant arrived but changed after talking on the phone. Mr. Lemonds recalled that the Defendant was upset about "a girlfriend" but that the Defendant calmed down. Mr. Lemonds said that the Defendant "wasn't falling down" when the Defendant left and that the Defendant did not appear to be upset.

Mr. Lemonds testified that he learned of the victim's death early the next morning when the Defendant woke him. Mr. Lemonds said that the Defendant asked if Mr. Lemonds had heard that the victim died of a heart attack. Mr. Lemonds recalled that the Defendant was "[m]eek" and "[w]ithdrawn" and said that this was not his normal demeanor.

On cross-examination, Mr. Lemonds acknowledged that closer in time to the victim's death, he told the police that the Defendant left his home around 11:30 p.m. Mr. Lemonds agreed that his memory of the night was not clear because he and the Defendant drank most of two twelve-packs of beer in addition to moonshine. Mr. Lemonds said that he and the Defendant "were just sitting around having a good time" after the phone call and that he did not have any issues with the Defendant coming to his home.

Mr. Lemonds testified that he previously told the police that the Defendant said he was going to Mr. Russell's home because it was Mr. Russell's birthday. Mr. Lemonds agreed that he told the police the Defendant had been under the influence when the Defendant left Mr. Lemonds's home. Mr. Lemonds agreed that he was "groggy" when the Defendant woke him the next morning and that he and the Defendant were "sad" about the victim's death. Mr. Lemonds agreed that he did not hear the Defendant talk on the phone while the Defendant was at his home.

A recorded 9-1-1 call, which was received as an exhibit, was placed on March 31, 2012, at 1:09 a.m. The caller, who was later identified as the Defendant's father, advised that the victim was "down, not breathing."

Gibson County Sheriff's Investigator Megan Shanklin testified that she responded to the scene around 2:00 a.m. She recalled that law enforcement officers, medical personnel, neighbors, the Defendant, and the Defendant's father were at the scene. She said that the victim lay on his back on the kitchen floor. Photographs of the home were received as an exhibit and showed, in relevant part, the victim on the kitchen floor; an overturned computer tower; a computer cord; a broken cell phone near the computer tower; overturned chairs; a table with a broken leg; and Mr. Russell's shirt, which was in the den area on the back of a chair and which Investigator Shanklin believed to have blood on it. Photographs of the victim reflect markings of what Investigator Shanklin described as bruising on the victim's left shoulder and right arm, along with scratches on the mouth, chin, and upper lip. The victim also had markings on his left shoulder blade and left hand, along with "ligature marks around" the left wrist and a scrape or carpet burn on the knee area. Investigator Shanklin stated that the cell phone recovered from the scene belonged to the victim. She said that she recovered the computer cord because the markings on the victim's arms appeared to her to be consistent with the cord. She said that the cord was unplugged from the outlet and the computer tower and that it seemed out of place.

Investigator Shanklin testified that during her investigation, she learned that the Defendant's father placed the 9-1-1 call and that the Defendant's mother, who was a nurse practitioner, had been at the scene before Investigator Shanklin arrived. She said that she and Lieutenant Steve Green interviewed the Defendant at the sheriff's office. A recording of the Defendant's interview, which occurred on March 31 or April 1, 2012, was played for the jury.

-4-

In the recording, the Defendant stated that he left Mr. Lemonds's home around 10:00 or 11:00 p.m. and that he found the victim "passed out in the floor" when he went inside Mr. Russell's home. The Defendant said that that the home was dark, that he attempted to carry the victim to the victim's bedroom, that he dropped the victim a couple of times, and that he needed assistance moving the victim to the victim's bed. The Defendant said that he called his father for help and that they moved the victim to the kitchen, which had better lighting. The Defendant said that when they dropped the victim on the kitchen floor, he saw the victim's face and checked for a pulse. The Defendant said that he thought he felt a pulse initially but that he did not feel a pulse when he checked again. The Defendant said the victim "didn't look right." The Defendant said that his mother, a nurse practitioner, came to the home and that the Defendant performed CPR. He said that an ambulance was called to the home and that he went outside to watch for and to direct the ambulance to the home.

The Defendant stated that the screen door was closed but the storm door was open when he arrived at the home. He said that he was not certain anyone was home but that he wanted to wish Mr. Russell a happy birthday. He said that he walked inside the home and that the victim was on the floor near the computer. The Defendant thought, but was uncertain, the victim lay on his side near a computer chair. The Defendant said later that the victim might have been face down but "kind of on his side." The Defendant said that the victim lay "facing towards the door" and that the computer chair was behind the victim and "kicked out a little bit." He said that he attempted to wake the victim by shaking and rolling the victim and that he thought the victim was "passed out drunk." The Defendant said that he could not carry the victim, that he called his father for help, and that they moved the victim to the kitchen. He recalled that he grabbed the victim's upper body and that his father grabbed the victim's lower body. The Defendant said that they agreed the victim did not "look right." The Defendant noted that the victim's face was blue.

The Defendant stated he did not notice any blood. He said that as he performed CPR, the air he blew in the victim's mouth would not go down the victim's airway and was expelled. He said he performed CPR after his father arrived. The Defendant said that he dropped the victim a total of two to four times. The Defendant said the victim wore a shirt and shorts.

The Defendant said that before the victim's death, he had been at Mr. Russell's home the previous Thursday but that he did not talk to anyone. He said that there were two women at the home.

The Defendant stated that Cassie Brown was supposed to pick him up on the night of the victim's death but that she did not "show." He said that he called her but that she did not answer her phone. He thought this was "weird" because she always "came down on the weekends" and answered his calls. He said they "broke up for a minute." He said that he last spoke to her the previous Wednesday on the phone and that he asked her to go

out with him. He noted that he called her to arrange the date, that he had "blocked" her cell phone number, and that she could not call his phone. He said that when she did not show up that night, he called her phone twice.

The Defendant explained that he blocked Ms. Brown's number about three weeks before the interview because she was being "obnoxious," "tried to beat [him] up," and struck him on the head. He said that they were inside his truck outside Mr. Russell's home, that Ms. Brown refused to leave the truck, and that the victim "came out and got her." He said that after the incident, Ms. Brown continuously sent text messages to him and that he blocked her number.

The Defendant stated that Mr. Russell's home did not look unusual when he arrived, that he found the victim, and that he was not inside the home long before he left to bring his father to the home.

Investigator Shanklin testified that at the time of the police interview, the Defendant was approximately six feet, three inches tall and weighed 240 pounds. She said that no arrests were made until 2016, at which time the Defendant was charged in this case.

On cross-examination, Investigator Shanklin testified that she was not the first person inside the home and that other individuals who had been inside the home could have moved items but that the scene had been secured before her arrival. She agreed that the Defendant was at the scene when she arrived, that she spoke briefly to the Defendant, and that the Defendant said he went to "get his father to move" the victim and returned to the home. She agreed that the Defendant cooperated with her investigation and that the Defendant was intoxicated when she spoke to him at the scene.

Investigator Shanklin testified that Mr. Russell's home was known as the "party house" and that "people" came and went on the weekends. She agreed there was "some evidence of drug use" by the victim on the night of his death and that the toxicology report confirmed drug use. She said that blood was not recovered from the home other than from Mr. Russell's shirt. She did not see any blood on the victim or on the Defendant.

Investigator Shanklin testified that Mr. Russell's home remained unlocked "on a regular basis." She agreed that the Defendant said he thought the victim had "passed out" and attempted to move the victim to the victim's bed and that the Defendant reported dropping the victim before going home to bring the Defendant's father to the home to help. She agreed that if the Defendant touched the victim's shoulder, arms, or legs, the Defendant's DNA would be on the victim. She agreed that the Defendant had been at the home several times before the victim's death and that the Defendant could have left behind DNA when there. She agreed that the Defendant and the Defendant's father stated they attempted to move the victim and that evidence from the scene showed the victim was moved from the computer area to the kitchen. She agreed the Defendant consented to

-6-

providing a DNA sample, which other evidence showed was obtained on July 31, 2012, and that the Defendant performed CPR on the victim when the Defendant and his father realized something serious was wrong with the victim. She said that the Defendant's DNA was the only sample obtained during the investigation.

Investigator Shanklin testified that a period of time elapsed between Mr. Russell's leaving the home and the Defendant's arriving and that she did not know who "came and went" during this time. She said that the Defendant reported being at the scene for about five minutes. She said that the Defendant "was intoxicated and just kind of everywhere." She did not recall her preliminary hearing testimony in which she said the Defendant was hysterical at the scene. She said the Defendant walked to the end of the driveway "for the ambulance." She said she did not investigate whether the Defendant had "worked on or done anything on the computer or computer cord" or had "touched it or owned the cord." She said she likewise had not investigated whether the Defendant's father had traded the cord to the victim. She did not know the length of time the cord had been inside Mr. Russell's home. Investigator Shanklin said that items had not been knocked off a table in the living room area and agreed that the home "wasn't a total mess."

Tennessee Bureau of Investigation Forensic Scientist Lawrence James testified that he analyzed the DNA evidence obtained in this case. Mr. James concluded that the victim's left fingernail clippings obtained during the autopsy contained the victim's DNA and a DNA profile consistent with the Defendant's profile. Mr. James concluded that the wall plug of the computer cord contained the victim's DNA profile and a DNA profile consistent with the Defendant's profile. Mr. James concluded that the "length of the cord" contained the victim's DNA profile and a DNA profile consistent with the Defendant's profile. Mr. James concluded that Mr. Russell's work shirt contained blood matching the Defendant's DNA profile.

On cross-examination, Mr. James testified that he likewise analyzed fingernail clippings from the victim's right hand, the victim's shirt, the victim's cell phone, and swabs from a pair of boots, the edge of the desk, the "outside wall," the front porch, and the outside steps. Mr. James analyzed the collar of the victim's shirt, and he concluded that it contained a DNA profile consistent with the victim's profile but that the minor contributor DNA profile "was not interpretable." Mr. James's analyses of the cell phone, boots, and swabs from the front porch and steps did not reveal any evidence attributed to the Defendant.

Mr. James testified that the partial DNA profile consistent with the Defendant's profile found on the computer cord could have come from "contact, touching, like from sweat . . . , [and] skin cells." He conceded that he could not determine the duration of time any DNA might have been on any particular item, including the computer cord.

On redirect examination, Mr. James testified that he had not seen photographs of the scene. The photographs of the victim showed, in relevant part, that medical personnel had provided treatment and that the victim was shirtless. Mr. James said that he did not know if the shirt he analyzed was worn by the victim on the night of his death.

Paramedic Zack Marbry testified that he responded to the scene and that the victim lay on his back on the kitchen floor. Mr. Marbry said that the victim was not breathing, that a cardiac monitor was place on the victim, that the monitor showed the victim's heart was not beating, and that the victim was deceased. Mr. Marbry noticed ligature marks on the victim's wrists and said a computer had been "torn apart," a chair had been broken, and a cell phone had been broken.

Mr. Marbry testified that the Defendant met him and another paramedic, who was deceased at the time of the trial, in the front yard and that the Defendant said a nurse practitioner, who was the Defendant's mother, came to the scene before the 9-1-1 call and pronounced the victim deceased. Mr. Marbry said that it was unusual for a healthcare professional to arrive, not provide aid, "abandon the patient," and leave before other medical personnel arrived. Mr. Marbry said the Defendant's mother was not at the scene when he arrived.

Mr. Marbry testified that the Defendant reported having attempted to move the victim to the victim's bedroom. Mr. Marbry said that the victim's feet were pointed toward the direction of the bedroom and that, based upon his experience, moving a person required "gather[ing the person] up under their arms so you have control of their head and . . . torso[.]"

On cross-examination, Mr. Marbry testified that when he arrived, the Defendant left the house, "screaming to hurry." Mr. Marbry said that if the victim wore a shirt, it was pulled up but not removed and that he did not remove clothes in these circumstances. He explained that he either pulled a shirt toward the neck or cut a shirt down the center to gain access to the chest. He agreed that the victim lay close to his bedroom door.

Cassie Brown testified that in 2012, she and the Defendant were romantically involved periodically and that she "would hang out" with the victim and Mr. Russell on the weekends. She said that Mr. Potts, Mr. Wayde, and Lawrence Hendricks also socialized with the victim and Mr. Russell regularly and that the Defendant socialized with the group "on occasion."

Ms. Brown testified that on the night of the victim's death, she had plans to "hang out" and drink alcohol with the Defendant and noted that she and the Defendant had "broken things off for a little while." She said that although she and the Defendant planned to meet between 7:00 and 8:00 p.m., she became upset because she received photographs of the Defendant with other women and that their meeting never occurred. She recalled

that one of the women was Ms. Barringer, who had been at Mr. Russell's house "a couple of times, but nothing major." Ms. Brown said that she and the Defendant spoke on the telephone and that she told the Defendant she was not going to meet him because the victim "and other people" sent photographs to her of the Defendant with other women. She said she told the Defendant that she "wasn't gonna do it anymore, because it hurt [her] feelings."

Ms. Brown testified that afterward, the Defendant called her multiple times during the course of several hours but that she only answered the phone once around 10:00 or 10:30 p.m. She said that she repeated to the Defendant that she was not going to meet him and that she ended the relationship. She said that the Defendant called again around 11:10 p.m. but that she did not answer the call. She said that "shortly" afterward, she received a call from the victim's cell phone but that she did not answer the call. She said that she received a call from the Defendant's cell phone again a few minutes later but that she did not answer the call. She said that she attempted to return the victim's call, that she intended to ask if the victim needed something, and that the victim did not answer her call. She said she also sent the victim a text message, which went unanswered.

Ms. Brown testified that she learned around 1:00 or 1:30 a.m. from her cousin, who lived across the street from Mr. Russell's home, that the victim had died. Ms. Brown said that she last saw the victim at the home about three or four days before his death and that he was not feeling well. She recalled that the victim was sick and could not breathe well and that he played on the computer, although he was not "up and about . . . in the house" much. She said that between 2:30 and 3:00 a.m., the Defendant called her again but that she did not answer the call.

Ms. Brown testified that the Defendant "had his nice moments" but that he "was angry sometimes." She said that she saw the Defendant use injectable steroids "within a few months" of the victim's death. When asked to describe the victim's relationship with the Defendant, Ms. Brown said that everyone "tried to get along" but that the victim told her not to bring the Defendant to the home because the Defendant "would disrespect our home." She said the victim did not want the Defendant at the home.

Ms. Brown testified that during the time leading up to the victim's death, the Defendant had "blocked" her cell phone number, preventing her from calling the Defendant. She said, though, her number was not blocked on the night of the victim's death.

On cross-examination, Mr. Brown testified that she and the Defendant were not "fighting" at the time of the victim's death. She agreed she told the police at the time of the victim's death that her relationship with the Defendant "wasn't working out" because the Defendant wanted "independence" and because she wanted "to settle down." After reviewing her police statement, she said she told the police that the Defendant had blocked her cell phone number from his phone three weeks previously and that she could not call

the Defendant. She agreed that the Defendant "stayed away" from her for a period of time and that during this time, she "made new acquaintances."

Ms. Brown testified that the Defendant and the victim were friends "[a]t one point in time" but that the men were not friends at the time of the victim's death. She said that she and the Defendant had an argument in the victim's presence after the photographs of the other women were sent to her. She said that she and the Defendant were inside the Defendant's truck when the argument occurred and that the truck was parked at Mr. Russell's home. She acknowledged that she struck the Defendant open-handed, "slapping him in the head" but stated that the Defendant did not strike her. She agreed that the Defendant yelled for the victim to "come get" her, that the Defendant "was trying to stop" the argument, that the victim came outside the home and "got" her, and that the Defendant left.

Ms. Brown testified that Mr. Russell's home was always open and that "people came and partied." She agreed that she "verified" with Ms. Barringer the photographs she received of the Defendant with other women and that she reported this information to the police. Ms. Brown acknowledged she told the police at the time of the victim's death that she spoke to Ms. Barringer about the photographs in October. Ms. Brown agreed that the argument in the Defendant's truck occurred when she learned of the photographs. She agreed that after October, she, the Defendant, and the others who frequented the home had socialized several times at Mr. Russell's home.

Ms. Brown testified that the Defendant was not angry or rude, did not curse, and was calm when she told the Defendant she would not meet him on the night of the victim's death. She said the Defendant only wanted to know the reason she would not meet him and was "a little argumentative." She acknowledged that she told the police the Defendant told her that he "wanted to explain" himself, that he would "leave it alone" if she did not want to meet, and that he would not call her anymore. She agreed that the Defendant was calm during the discussion.

Ms. Brown testified that although the victim had said previously he did not want the Defendant at Mr. Russell's home, there were not any issues between the men at the time of the victim's death. She agreed that the men had not argued and that nothing out of the ordinary had occurred at the time of the victim's death.

Yancy Potts testified that in 2012, he was friends with the victim and Mr. Russell, that he socialized at Mr. Russell's home regularly, and that the home was his "second home." Mr. Potts stated that he was at Mr. Russell's home for "half the night" on the evening of the victim's death. Mr. Potts recalled that the victim, Mr. Russell, Mr. Wayde, and "Heather" were at the home and that the victim was in bed most of the time. Mr. Potts said that the victim enabled the Wii console for everyone else to play and returned to his

bedroom. Mr. Potts said that the victim's computer and the Wii were in the same room of the house and that the victim's bedroom was near the kitchen.

Mr. Potts testified that he drank alcohol at the home on the night of the victim's death and recalled that Mr. Russell and "some of his friends," which included Heather, left the home to go to a bar. Mr. Potts said that he did not go to the bar because he was too intoxicated and that he and Mr. Wayde, who lived together at the time, went home about ten to fifteen minutes later. Mr. Potts said Mr. Wayde, who had also drank alcohol, slept on the couch before they left. Mr. Potts said that only the victim remained in the home when Mr. Potts and Mr. Wayde left. Mr. Potts thought the victim was in his bedroom and said he did not see the victim again after the victim enabled the Wii and returned to bed. Mr. Potts stated that around 3:00 or 4:00 a.m., he received a telephone call and learned that "something happened" to the victim.

On cross-examination, Mr. Potts testified that he and Mr. Wayde went to Mr. Russell's home "later the same day," that the police took them to the jail, that they were held overnight due to their intoxication, and that they were questioned the next morning. Mr. Potts said that the police did not read him any *Miranda* warnings before questioning him. After reviewing his police statement, he said that he did not recall any rights being read to him and that he was still intoxicated when he spoke to the police. He agreed that he answered the investigator's questions. He agreed that he was also "messed up" before leaving Mr. Russell's home the previous night.

Shane McBride testified that he lived with his stepmother, Lisa Wolfe, across the street from Mr. Russell's home. Mr. McBride said that he went to Mr. Russell's home on the night of the victim's death but that he went home before sunset. He recalled that Amanda Mayfield, whom he was dating at the time, was with him that night. Mr. McBride said that later in the night he saw the Defendant run down Mr. Russell's driveway as he yelled, "[H]elp, help, help." Mr. McBride said that the Defendant waved at an ambulance that turned into the driveway and that Mr. McBride and Ms. Mayfield ran behind the ambulance to the home. Mr. McBride said the Defendant "picked [him] up" and hugged him. Mr. McBride said the Defendant stated that they were "lucky" and "I'm sorry." Mr. McBride said that the Defendant did not explain about what he was sorry and that he told the Defendant to put him on the ground. Mr. McBride said that he saw "[c]law marks" on the Defendant, whose shirt was "stretched." Mr. McBride said that after the Defendant returned him to the ground, the Defendant picked up an object, which was described as "either a bird figure or something," and threw it at the windshield of the Defendant's truck. Mr. McBride recalled that the windshield shattered and said that the police arrived and told him and Ms. Mayfield to leave the property.

-11-

On cross-examination, Mr. McBride testified that he did not know who came and went from Mr. Russell's home before Mr. McBride saw the Defendant running down the driveway to meet the ambulance. Mr. McBride said the Defendant was "upset and crying" and did not say anything to suggest he had been involved with the victim's death.

Mr. McBride testified that the police did not talk to him until 2015 and that he did not think what he saw on the night of the victim's death warranted contacting the police. He agreed that he did not mention during his police interview the Defendant's having claw marks and a stretched shirt. Although he did not recall his preliminary hearing testimony, he agreed a transcript reflected he testified that the Defendant "may have had a worn out shirt on, like he had been working, but it was stretched" and that he "didn't think nothing about it."

Amanda Mayfield testified that she and Mr. McBride shared a child and that she met Mr. Russell, the victim, and the Defendant through her connection with Mr. McBride. She said that on the night of the victim's death, she saw an ambulance and the Defendant standing in the middle of the road "[w]aving the ambulance down." She said that she and Mr. McBride walked to Mr. Russell's front yard but that she did not speak to the Defendant. She recalled, though, that the Defendant was "agitated" and "screaming" and that the Defendant "kept saying, I'm sorry, and just screaming and mad." Ms. Mayfield said that the Defendant's shirt was "ripped" and that there were "marks" on the Defendant's "neck down to his back maybe."

Ms. Mayfield testified that the Defendant mentioned the Defendant's mother had been at the home "to pronounce [the victim] dead." Ms. Mayfield provided testimony consistent with Mr. McBride relative to the Defendant's picking up Mr. McBride and to the Defendant's shattering the truck windshield.

On cross-examination, Ms. Mayfield testified that the police spoke to her several years later. She agreed that she did not mention the claw marks and the stretched shirt to the police or during her previous testimony. She said that she only testified that the Defendant was "upset," "hysterical," and yelling, "Oh, God, help, help;" that she did not know who had access to Mr. Russell's home; and that the Defendant shattered the truck windshield.

On redirect examination, Ms. Mayfield testified that she told the police the Defendant and the victim "didn't get along" and that the Defendant was not supposed to be in Mr. Russell's home. On recross-examination, Ms. Mayfield said that she saw the Defendant at the home "at regular times during this time frame." She said it was not unusual for the Defendant to be at the home. She agreed she told the police that the day after the victim's death, she and others were at Mr. Russell's home and that they talked about what they thought occurred. She told the police that "we" thought the victim told

the Defendant to leave, that the Defendant declined to leave, that the Defendant became angry, and that the Defendant killed the victim. She agreed this was merely a theory.

Christopher Lynch provided testimony consistent with that of Mr. Russell in relation to his picking up Mr. Russell and driving to the bar. Mr. Lynch testified that he picked up Mr. Russell around 10:30 p.m. and that Mr. Potts, Mr. Potts's girlfriend, and Mr. Wayde were the only people he saw at the home. Mr. Lynch said that he worked for the volunteer fire department and that he received a "page" on his telephone about someone falling onto the floor at Mr. Russell's home. Mr. Lynch said that Mr. Russell thought someone was most likely intoxicated but that Mr. Russell's cell phone "started blowing up." Mr. Lynch said that they learned the victim had died and that they returned to Mr. Russell's home. Mr. Lynch said that first responders were at the home when they arrived, that he walked into the living room and spoke to a firefighter, that he assumed the victim had suffered a heart attack, and that he left and drove home. Mr. Lynch said he did not see the Defendant.

On cross-examination, Mr. Lynch testified that nothing appeared to be unusual at the home when he picked up Mr. Russell but that the home belonged to a "40 year old bachelor. It wasn't exactly kept." Mr. Lynch said that when he returned to the home, he "noticed something was off in the dining room area" and thought "some things were missing."

Miguel Laboy, M.D., an expert in forensic pathology, testified that he performed the victim's autopsy. Dr. Laboy concluded that the cause of the victim's death was strangulation and that the manner of death was homicide. Dr. Laboy identified "finger impressions" on the wrists, back of the hands, and left thigh. He said that the markings on the left wrist were consistent with its having been "tied" before the victim's death. Dr. Laboy concluded that the thyroid cartilage and hyoid bone were fractured and that the head showed multiple contusions and lacerations. He noted a laceration on the upper left ear and a hematoma on the lobe and concluded that the victim suffered an impact hard enough to tear the ear and to cause hemorrhaging. Dr. Laboy identified nine bruises or abrasions on the head. He identified contusions and abrasions to the upper extremities, all of which indicated trauma. He concluded that the hemorrhages on the front and back of the neck were consistent with a "struggle," rather than a fall from a chair. He said that the neck injuries were consistent with manual strangulation and that the strangulation occurred before death.

On cross-examination, Dr. Laboy testified that dating bruises was "not accurate." He said that, generally, a purple-red bruise was recent and that such a bruise could have been caused "hours, maybe a day, maybe a little more, or maybe a little less." He said that the bruising he previously described on the victim was green and brown and that the others were older. When asked if the victim's having been dropped could have caused the marks and contusions, Dr. Laboy stated that the bruises could have occurred perimortem, which he was just before death, but that other injuries "doesn't allow blood to flow there."

-13-

Dr. Laboy testified that the fractures to the hyoid bone and thyroid cartilage could occur as a result of trauma, such as hitting a steering wheel during a traffic accident, but that the injuries needed to be explainable. He said that if a person fell out of a chair and struck another chair, some of the injuries were explained. He said, though, that blunt trauma could have caused the fractures. When asked if the abrasions could have been caused by "dropping or movement," he said that scrapes could occur many different ways, including a fall resulting in a hard hit. He agreed that he did not see any petechiae hemorrhages in the victim's eyes and said that petechiae were the "most common[]" factor indicating strangulation. He said, though, that petechiae were not always present in strangulation deaths. He agreed that the neck had no ligature marks but said that the small tear with a hematoma indicated the neck "got an impact with something." He said that he identified lineal hemorrhages close to the tongue, which were common in strangulation deaths.

Dr. Laboy testified that the toxicology analysis showed the presence of pseudoephedrine, methamphetamine, marijuana, an antidepressant medication, and an antihistamine medication. He agreed that the heart was enlarged and dilated, that mild atherosclerosis was present, that the liver was fatty, and that the victim was obese. Dr. Laboy did not recall being provided information that the victim felt unwell at the time of his death.

Julia Fletcher testified for the defense that in 2012, she and her husband were livestock farmers and that the victim worked periodically for them. She recalled that the victim came to her home to visit with her and her husband on the day of the victim's death. She said the victim "kept leaning over and coughing like." She said that the victim denied being sick but that her husband said it sounded as though the victim was having "a problem getting . . . air" and told the victim to see a doctor. She said that the victim responded he did not want to go to the doctor and that the victim stayed a little while longer before leaving. She acknowledged that Roy Byrer, the Defendant's father, was her brother.

John Hunsaker, a forensic pathology expert, testified that he found "no features externally on the skin of manual strangulation," which he described as strangulation by applying pressure with the hands, and that he saw no features indicating ligature strangulation, which he described as strangulation by use of a cord or rope. He said that when the neck was "squished so hard" for death to occur, the "whole complexion turn[ed]." He said that some of the photographs taken during the autopsy reflect "a little bit of discoloration in [the] face and neck" and that other photographs did not reflect discoloration. He said that the main feature of strangulation was "little pinpoint hemorrhages . . . on the skin of the face, on the eyeballs, on the eyelids inner lining, on the lining of the mouth." He said this feature, along with the feature that tonsils on the tongue filled with blood, was not present in this case. Dr. Hunsaker said that because of the absence of these features, he "strongly" considered something "besides manual strangulation" as the cause of death. He noted that generally, a person being strangled

-14-

showed many "markings, bruising, scraping, claws all around the front and side part of the neck."

Dr. Hunsaker testified that although the internal examination during the autopsy showed features of strangulation, "there were other features that could have been caused by other mechanisms than the squishing of the neck by somebody's hands." He said that although a broken hyoid bone and broken thyroid cartilage were features of strangulation of any type, those fractures were not exclusively caused by strangulation. He said that the neck being struck with a blunt force object with sufficient force could result in the fractures. He said that the second primary manner in which the fractures could result was during a fall against a blunt object. He stated that either manner would result in bleeding around the area. He said that it was possible for the computer table and chairs to have caused the blunt force injury.

Dr. Hunsaker testified that a person could live for a few days if the person suffered an injury or fracture to the hyoid bone and thyroid cartilage. He explained that if those structures were not properly aligned after blunt force injury but were not "completely" blocking the passage of oxygen, the person could exhibit difficulty breathing. He said that it was also possible that a person would cough up blood with fractures to those areas without immediate death but that any injury would require surgical intervention.

Dr. Hunsaker testified that Dr. Laboy's conclusion that the formation of a bruise required a beating heart was untrue. He said that if a broken vessel, which included a tube, had blood inside and there was "enough space around that blood vessel" for blood to leak from the vessel below the skin, a bruise would form regardless of whether a person was alive or deceased. He cited previous cases in which a deceased person had been dropped after death and bruises had resulted.

Dr. Hunsaker testified that timing of an injury and of death were critical questions for a medical examiner and that it would have been helpful if during the autopsy, microscopic examination of the underlying skin of the hands and wrists had been performed in order to determine the timing of the injuries. He said, as well, that microscopic examination of the cells around the hyoid bone and thyroid cartilage would have similarly been helpful in determining the timing of the injuries, either before or after death. When asked if evidence of the victim's having difficulty breathing on the day of his death had any impact on his conclusion relative to when the hyoid bone and thyroid cartilage were injured, Dr. Hunsaker opined that the injuries occurred before the victim's death and that his difficulty breathing "could be explained by nonfatal injuries to those areas in the neck." Dr. Hunsaker acknowledged that he did not know when the injuries occurred but that it could have been one day or hours before death, which was why microscopic examination of the tissue in the neck was critical. Dr. Hunsaker stated that the victim's heart was "about twice normal size" and that his lungs were "almost twice the normal weight and filled up with fluid of different types[.]"

On cross-examination, Dr. Hunsaker testified that his conclusion was that the victim's cause of death was "complications of blunt force injuries of his neck that got progressively worse over several days." He concluded that the victim died of "gradually progressive asphyxia due to the abnormal configuration of the bone structures . . . in his neck." He concluded, as well, that the victim's abnormally large heart contributed to the victim's death.

Dr. Hunsaker agreed with Dr. Laboy's conclusions that there were structural injuries to the thyroid cartilage, a fracture to the hyoid bone, and hemorrhaging of the blood vessels in the neck. Dr. Hunsaker concluded, though, that the injuries and hemorrhaging resulted from the victim's "breathing [becoming] progressively worse and then eventually he did stop breathing," which resulted in death. When asked if he agreed that the victim's cause of death was manual strangulation as determined by Dr. Laboy, Dr. Hunsaker said that if it were established "it could be an accident," the cause of death could be homicide or undetermined.

Dr. Hunsaker testified that it took "a substantial amount of force" to cause the victim's neck injuries but "strictly for someone who doesn't have any bone disease or cartilage disease that makes them more susceptible to breakage." He said that he did not have objections to the tissue dissections taken and examined during the autopsy from the heart, lungs, and liver. However, Dr. Hunsaker said that a tissue dissection was not obtained from the areas of bleeding in the neck.

Dr. Hunsaker testified that the toxicology report showed that the victim had taken antihistamines, which Dr. Hunsaker said was an attempt to correct difficulty breathing, and that the victim could have taken those medications in connection with a cold, allergies, or sinus issues. Dr. Hunsaker did not have objections to Dr. Laboy's conclusion that the wrist impressions were ligature marks but that he could not conclude the wrists had been "tied up." Dr. Hunsaker said that enough pressure was applied to the wrists to result in the markings, that a cord was found at the scene, but that the "reason for the cord being applied" was unknown. Regarding the discoloration on the face and neck noted by Dr. Laboy, Dr. Hunsaker stated that "many dead bodies of any kind of trauma, when they're lying down, you [have] the discoloration. But it's a different universe when someone is manually strangled." Dr. Hunsaker concluded that there were not "any markings of blunt force of significance on the skin of the neck."

Dr. Hunsaker testified that some of the neck muscles were "scattered about at areas of bleeding" but that he would "not call those hematomas," which he said resulted when a large collection of blood formed a mass. He agreed, though, that the "neck muscles may show hematoma or even lacerations." He agreed that a fracture of the hyoid bone was a feature of manual strangulation.

Dr. Hunsaker's report was received as an exhibit. The report reflects, in relevant, part, twelve criteria on an external examination to support a finding of strangulation. Dr. Hunsaker concluded that nine of the criteria were not present during the physical examination. The report reflects nine criteria on an internal examination to support a finding of strangulation. Dr. Hunsaker concluded that five of the criteria were not present during the internal examination.

Roy Byrer, the Defendant's father, testified that on the night of the victim's death, he received a text message from the Defendant sometime after midnight. Mr. Byrer said that the message woke him and that the Defendant wanted to talk and asked him to come outside. Mr. Byrer said the Defendant reported that the victim was "passed out drunk" on the floor and asked for Mr. Byrer's assistance to move the victim to the bedroom. Mr. Byrer acknowledged that he resisted because of the reputation of Mr. Russell's home but said that he agreed to help after the Defendant stated the victim had been "really sick" and nobody else was at the home to help the victim. Mr. Byrer said the victim lay "in the edge of the dining room" near the living room. Mr. Byrer said that the Defendant attempted to pick up the victim "under the arms" but that the Defendant dropped the victim. Mr. Byrer recalled that the victim "hit the floor hard." Mr. Byrer said that the Defendant asked if he were going to help and that Mr. Byrer grabbed the victim's feet. Mr. Byrer said that the Defendant grabbed the victim "under the arms around [the] chest . . . to pick [the victim] up." Mr. Byrer recalled that the victim was heavy and said,

> We're bumping his behind on the floor as we're going, because we weren't doing it very good. We made it into the kitchen. And, right even with the back door, I don't remember if I dropped my end or if he dropped his end, but somebody dropped their end first. And then, of course, the other person dropped. He hit the floor hard again. Didn't make a sound. Didn't groan. Didn't . . . move or wiggle. That was kinda weird.

Mr. Byrer testified that he noticed while in the kitchen that the victim did not "look right," that the victim was "swollen up, bloated up," and that his mouth was partially open with the tongue visible. Mr. Byrer said that he expressed his concerns to the Defendant, that the Defendant checked for a pulse multiple times, and that although a pulse was detected initially, the Defendant said the victim did not have a pulse. Mr. Byrer said he told the Defendant to perform CPR, that the Defendant performed CPR, and that the Defendant noted the victim was not wearing his dentures and thought the victim might have "choked on them." Mr. Byrer said that he decided to call his wife, who was a nurse practitioner, for medical assistance and that his wife agreed to come to the home to help the victim. Mr. Byrer recalled that the Defendant continued performing CPR while they waited for her to arrive and that she arrived ten to fifteen minutes later. Mr. Byrer said that his wife used a stethoscope to listen to the victim's chest and neck and shined light in the victim's eyes. Mr. Byrer said that his wife motioned for him to walk outside with her while

the Defendant stayed with the victim. Mr. Byrer said that the Defendant was "getting really agitated" and frustrated.

Mr. Byrer testified that his wife said the victim was dead and had been dead for a while because the victim was "stone cold." Mr. Byrer said that he called 9-1-1 at his wife's instruction and that he used the Defendant's cell phone to place the call. Mr. Byrer said that he told his wife to return home because she had two jobs at the time and had to wake early for work and that he would call her if the police or paramedics wanted to speak to her. Mr. Byrer said that his wife went home, that he returned to the Defendant, who was still performing CPR, and that the Defendant became agitated when the Defendant began to realize the victim was deceased. Mr. Byrer said that as the Defendant's agitation grew, the Defendant became more aggressive with CPR in the effort to revive the victim. Mr. Byrer said that the Defendant sweated due to performing CPR for some time. Mr. Byrer said that the home was a distance from the roadway and that he sent the Defendant down the driveway to wait for the ambulance. Mr. Byrer said that he stayed with the victim while the Defendant waited for the ambulance at the end of the driveway.

Mr. Byrer testified that when the paramedics arrived, the Defendant told the paramedic, "Come on. Get in there. Get in there and help my friend . . . Come on. Run." Mr. Byrer recalled that the paramedic declined to run. Mr. Byrer said that he asked the paramedics if the victim was deceased and that the paramedic stated, "Sir, this man is definitely dead." Mr. Byrer said that he left the home, that he told the Defendant that the victim was deceased, and that the Defendant "lost it." Mr. Byrer said that the Defendant cried out and walked around in disbelief that the victim was deceased. Mr. Byrer said that the detectives arrived and that the detectives told him and the Defendant to remain outside but not to leave the property. Mr. Byrer said that after he and the Defendant provided short, written statements, they were allowed to leave.

Mr. Byrer testified that when he entered the home, the victim lay in the computer room area, which was located where the "dining room meets the living room." Mr. Byrer said he noticed that a computer tower lay on its side, that the cords to the computer tower were "coiled out in the floor," and that he moved the cords out of his way when he attempted to lift the victim's feet. Mr. Byrer knew he touched the victim's ankles but was unsure if he touched the victim anywhere else.

Mr. Byrer testified that he and the victim "kind of had a deal" about computer equipment. Mr. Byrer said that, at his request, the Defendant had previously taken some equipment to the victim. Mr. Byrer said that the Defendant was the "go between" between Mr. Byrer and the victim when it came to computer equipment because Mr. Byrer did not want to go to Mr. Russell's home. Mr. Byrer recalled that he had the Defendant deliver to the victim a "power supply for a computer," a computer "video card," and a computer case.

On cross-examination, Mr. Byrer testified that the Defendant lived with him and his wife at the time of the victim's death. Mr. Byrer did not know the Defendant's activities on the night of the victim's death. Mr. Byrer acknowledged the Defendant's police statement in which the Defendant said he left Mr. Lemonds's home around 11:00 p.m. and said that the non-stop drive between Mr. Lemonds's home and Mr. Russell's home took "just a few minutes." Mr. Byrer said that it was possible the Defendant had been at Mr. Russell's home for about forty-five minutes when the Defendant sent the text message around midnight. Mr. Byrer said that he did not call the police when he first arrived at Mr. Russell's home because he knew "what kind of place it was" and knew Mr. Russell would not want the police in the home. Mr. Byrer said that he also did not want to call the police because he thought drugs might be found in the home at a time when he and the Defendant were inside and that "[w]ouldn't be very good."

Mr. Byrer testified that the victim was about one foot above the floor when he and the Defendant were lifting the victim. Mr. Byrer said that initially, he was not concerned about the victim's condition but that it was dark in the computer room. He said that he did not notice anything significantly wrong with the victim until he and the Defendant moved the victim to the kitchen, where the lighting was better. Mr. Byrer recalled that the victim wore a shirt.

Christine Byrer, the Defendant's mother and a nurse practitioner, testified that after going to bed for the evening, Mr. Byrer received a text message from the Defendant and that Mr. Byrer left with the Defendant. She said that she received a telephone call about ten to twenty minutes later from Mr. Byrer asking her to come to the home to examine the victim because the victim was not moving or breathing. She said that she dressed, washed her face, combed her hair, grabbed her stethoscope and flashlight, and drove to Mr. Russell's home. She said it took a few minutes for her to wake before driving. She said that when she arrived, Mr. Byrer explained that the Defendant found the victim on the floor, that Mr. Byrer attempted to help move the victim to a bed, that they dropped the victim, that the victim did not moan or groan, and that Mr. Byrer thought the victim might be deceased. She said that Mr. Byrer wanted her assessment of whether the victim was deceased or simply intoxicated or "high."

Ms. Byrer testified that the victim had always been a tall, thin man but that the victim appeared to be about forty pounds heavier. She said that the victim was "badly swollen," which she said was generally caused by "decompensated heart failure." She knew from the "spread of fluid all around him" that the bloating was not from weight gain. She said that his arms and legs showed "scratch marks" and that his color was "pale." She said that she immediately listened to his chest for "cardiac sounds," that she heard nothing, and that she did a "chin lift, head tilt back" to look for obstructions in the airway. She did not find any obstructions or sounds of breathing. She noted that the "secretions in his nose were dry;" that his body was cold, although the room was heated and comfortable; and that his pupils were fixed and "somewhat dilated." She said that based upon her previous

experience as a cardiac nurse, the victim had "all the signs and symptoms of being dead." She noted that the victim was "very cold" and that in her opinion, the victim had been dead "for quite a while." Ms. Byrer said that she did not render aid to the victim based upon her assessment and the victim's lack of response to several minutes of CPR.

Ms. Byrer testified that she returned home at her husband's encouragement because it was late and because she had to work the next day. She said that she drove one hour to work and that she could not do anything to help the victim. She said that she did not know the victim's medical history or the events of the evening and that she would have returned to the home if the paramedics needed her. She said that she was present when her husband called 9-1-1 and that afterward, she returned home. She said that none of the first responders asked to speak with her.

On cross-examination, Ms. Byrer testified that she had been a nurse practitioner for about ten years at the time of the victim's death. She said that it was apparent the victim was deceased when she arrived at Mr. Russell's home. She said that the victim had been deceased for a while because he was "cold and dead," had "no response to life," and "brain death [was] present."

Upon this evidence, the jury found the Defendant guilty of second degree murder. The trial court imposed a nineteen-year sentence. This appeal followed.

## I.      Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his second degree murder conviction. He asserts that the evidence failed to establish he killed the victim and that "there was a question as to the cause of the alleged victim's death." The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether

the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). A conviction may be based upon circumstantial evidence alone. *See Dorantes*, 331 S.W.3d at 380-381.

Second degree murder is a knowing killing of another. T.C.A. § 39-13-210(a)(1); *see id.* § 39-11-106(a)(20) (2018). With regard to second degree murder, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b) (2018); *see State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787. A knowing intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93.

In the light most favorable to the State, the Defendant arrived at Mr. Lemonds's home around 6:00 or 6:30 p.m. on the night of the victim's death. Mr. Lemonds lived one-half mile from Mr. Russell's home, at which the victim lived. Mr. Lemonds and the Defendant drank beer and moonshine during a four-hour period, after which the Defendant left. The Defendant, who did not appear upset, told Mr. Lemonds that he was going to stop at Mr. Russell's home when he left between 10:30 and 11:30 p.m. However, while at Mr. Lemonds's home, the Defendant became upset about "a girlfriend." Other evidence showed that the Defendant and Ms. Brown made plans to meet on the night of the victim's death but that Ms. Brown decided not to meet the Defendant because she received photographs of the Defendant with other women from the victim and other people, although she agreed she received the photographs in October of an unspecified year. Ms. Brown spoke to the Defendant on the phone around 10:00 or 10:30 p.m. while he was at Mr. Lemonds's home, and she explained her reason for not meeting the Defendant. The Defendant and Ms. Brown had a tumultuous relationship at times, including a physical altercation that occurred approximately three weeks before the victim's death. The incident occurred outside Mr. Russell's home and involved the victim's removing Ms. Brown from the Defendant's truck. Ms. Brown and Ms. Mayfield testified that the victim did not want the Defendant at Mr. Russell's home, and Ms. Mayfield testified that the men did not get along with each other. Evidence showed, as well, that about three weeks before the victim's death, the Defendant was involved in an altercation with Mr. Potts. Mr. Russell broke up the altercation and informed his landlord and the Defendant that Mr. Russell did not want the Defendant at the home. Mr. Russell thought the Defendant "wasn't acting right" around the time of the victim's death.

Mr. Russell, Mr. Potts, Mr. Wayde, and Ms. Barringer socialized at Mr. Russell's home on the night of the victim's death. The victim was home but did not feel well. The victim enabled the Wii console for the others to play and returned to his bedroom. However, Mr. Lynch picked up Mr. Russell between 9:30 and 10:30 p.m., and the two went to a local bar. Mr. Russell was intoxicated but recalled that Mr. Potts and Mr. Wayde were in the home but preparing to leave when Mr. Lynch picked up Mr. Russell. Mr. Potts

recalled that a woman went with them to the bar. Mr. Lynch and Mr. Russell remained at the bar until they were notified something happened to the victim, at which time they returned to the home. About fifteen minutes after Mr. Russell and Mr. Lynch left the home, Mr. Potts and Mr. Wayde, who lived together at the time, left the home. Mr. Potts recalled that the victim was in the victim's bedroom and was the only person in the home when he and Mr. Wayde left between 9:45 and 10:45 p.m.

Sometime around midnight, the Defendant was at his parents' home where he lived, which was about one-half mile from Mr. Russell's home, and he sent his father a text message in which he asked his father to come outside the home. The Defendant told Mr. Byrer that the victim was "passed out drunk" on the floor and asked for Mr. Byrer's assistance to move the victim to the victim's bedroom because the victim had been sick and because nobody was home to care for the victim. When the Defendant and Mr. Byrer arrived, which took only a few minutes, the victim lay on the floor near the living room on the edge of the dining room. Although the home was dark, the men were able to move the victim to the kitchen where the lighting was better. Mr. Byrer saw that the victim was "swollen up, bloated up" and had a partially open mouth, and Mr. Byrer sought medical assistance from his wife, a nurse practitioner. Ms. Byrer received a telephone call from Mr. Byrer about ten to twenty minutes after Mr. Byrer left their home with the Defendant, and she drove to Mr. Russell's home after she dressed, washed her face, combed her hair, and grabbed her stethoscope and flashlight. Once Ms. Byrer arrived, she examined the victim, who she determined had been dead for "quite a while." After her examination, Mr. Byrer placed the 9-1-1 call at 1:09 a.m.

This evidence established that the Defendant left Mr. Lemonds's home between 10:30 and 11:30 p.m., that the Defendant drove to the home at which the victim lived one-half mile away, that only the victim remained in the home after Mr. Potts and Mr. Wayde left the home between 9:45 and 10:45 p.m., and that the Defendant appeared at his family home around midnight, at which time the victim was deceased. The Defendant admitted in his police interview that he arrived at the home between 10:00 and 11:00 p.m. Photographs of the scene showed an overturned computer tower, the victim's broken cell phone, overturned chairs, and a table with a broken leg, which Mr. Russell said had not been the home's condition earlier in the night.

Dr. Laboy concluded that the victim's cause of death was manual strangulation, and ligature marks were found on the victim's wrists consistent with having been tied. Investigator Shanklin thought the ligature marks on the victim's wrists were consistent with the computer cord found on the floor near the victim's body. The cord had been dislodged from the computer tower and the outlet. The victim's thyroid cartilage and hyoid bone were broken, which were consistent with strangulation. Lineal hemorrhages close to the victim's tongue were also consistent with strangulation. The victim suffered "finger impressions" and hemorrhages on the front and back of the neck, which were consistent with a "struggle," rather than a fall from a chair. Other signs of trauma included a

laceration and hemorrhaging of the left ear, along with contusions and abrasions on the upper extremities and face. Investigator Shanklin observed bruising to the left shoulder and right arm, along with scratches on the mouth, chin, and upper lip. Although petechiae, which were the most common factor indicating strangulation, were not present in this case, petechiae are not always present in strangulation deaths. A DNA profile consistent with the Defendant's profile was found under the victim's fingernails, on the plug of the computer cord, and on the length of the cord. The Defendant's blood was found on Mr. Russell's work shirt that lay over a chair in the den.

After the first responders arrived at the scene, Mr. McBride and Ms. Mayfield, who were across the street, went to Mr. Russell's home. While standing outside the home, Mr. McBride saw "[c]law marks" on the Defendant, who wore a "stretched" shirt. Ms. Mayfield saw that the Defendant's shirt was "ripped" and that the Defendant had "marks" on his "neck down to his back maybe." The Defendant cried and threw an object, which shattered the windshield of the Defendant's truck. Ms. Mayfield noticed he was "agitated" and "kept saying, I'm sorry, and just screaming and mad."

Upon this evidence, the jury could have reasonably inferred that the Defendant went to the home after leaving Mr. Lemonds's home, that a physical altercation occurred between the Defendant and the victim, and that the Defendant used the computer cord to restrain the victim's wrists while manually strangling the victim. As a result, the jury could have found beyond a reasonable doubt that the Defendant acted knowingly because strangling the victim, thereby depriving him of oxygen, was reasonably certain to cause the victim's death. The evidence is sufficient to support the Defendant's second degree murder conviction.

In reaching this conclusion, we have not overlooked Dr. Hunsaker's conclusion that the victim's death resulted from "complications of blunt force injuries of his neck that got progressively worse over several days." We have likewise not overlooked defense proof establishing that the victim felt unwell in the time leading to his death. However, this court does not reweigh or reevaluate the evidence, and the determination of the credibility of the witnesses, along with the weight and value to be given to the evidence, is within the sole province of the jury. *See Bland*, 958 S.W.2d at 659; *see also Sheffield*, 676 S.W.2d at 547. Dr. Hunsaker's medical conclusions were presented to the jury, and the verdict reflects that the jury credited Dr. Laboy's conclusion that the victim's cause of death was manual strangulation. Based on Dr. Laboy's testimony and the physical evidence, the jury could have determined beyond a reasonable doubt that the victim's cause of death was manual strangulation.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-23-